IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 5, 2019

### STATE OF TENNESSEE v. JEANNETTE JIVES-NEALY

**Appeal from the Criminal Court for Shelby County**
No. 17-04173     James M. Lammey, Judge

_____

### No. W2018-01921-CCA-R3-CD

_____

Defendant, Jeannette Jives-Nealy, was convicted by a jury of theft over $60,000 and money laundering. The trial court sentenced Defendant to a total effective sentence of twenty-four years' incarceration. On appeal, Defendant asserts that: (1) the evidence was insufficient to support her convictions; (2) the trial court erred when it failed to sever the two counts of the indictment; (3) the trial court erred in allowing the jury to hear evidence of prior bad acts under Tennessee Rule of Evidence 404(b); (4) the trial court imposed an excessive sentence; and (5) the trial court erred by ordering Defendant to pay restitution to a victim, who had been paid in a previous civil court settlement. Following a thorough review of the record and applicable case law, we affirm the judgments of the trial court and remand for entry of an amended judgment for money laundering.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed; Case Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Eric Mogy (on appeal), and Claiborne H. Ferguson (at trial), Memphis, Tennessee, for the appellant, Jeannette Jives-Nealy.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Byron Winsett, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Rule 404(b) Hearing*

At a Rule 404(b) hearing prior to trial, the State asserted it intended to introduce evidence that Defendant was on probation out of Florida at the time of the instant offenses[1] and that the rules of Defendant's probation specifically provided that Defendant "was not allowed to engage in business that received funds from a federal, state, or local agency." The State asserted that the evidence established Defendant's intent and knowledge and argued that, without the proof, there would be "a gaping hole in the proof in this case." The State explained:

> The point of that evidence is that the documentary proof in this case will show [Defendant's] son's signature and name all over the documentary proof. That includes applications to the Tennessee Department of Human Services that was funding this program that includes signatures on the business account, the bank account, and on the checks and withdrawals from that account.

The State contended that Defendant's son's involvement was "mainly on [] paper" and that Defendant had a "reason for putting his name on those documents." The State acknowledged that the reason for the restriction in Defendant's probation was that "her crime in Florida was of a similar nature where there was funding coming from the government and abuse was found in Florida" but stated that it was "not trying to get into all the details of the crime." Defendant responded that the probative value of the evidence did not outweigh the unfair prejudicial effect.

Reviewing the issue under Rule 404(b), the trial court found that the proof of the "crime, wrong, or act" was clear and convincing. The court then stated:

> Now, material issue, of course, I think it's really relevant to show intent and knowledge and also to show why she had her son . . . [put] his name on all the paperwork. So, I think it's highly, highly material to those issues.

---

[1] Defendant was on probation in Florida for grand larceny and "fraud-swindle" at the time the instant offenses were committed.

Finally, the trial court determined that the probative value of the evidence was not outweighed by the danger of unfair prejudice, noting that the State was limiting its proof "to that particular provision of the probation order."

## Severance

At the conclusion of the Rule 404(b) hearing, Defendant requested that the trial court sever the offenses for trial. The trial court found, however, that the two charges were "totally intertwined" and stated, "I don't think it's a good situation to sever because I think proof of one is admissible in the other." The trial court denied the request for severance.

## Trial

### State's Proof

Carmen Gentry testified that, from July 2014 to August 2015, she was employed by the Tennessee Department of Human Services ("DHS") as the director[2] of two federally-funded food programs—the Summer Food Services Program ("SFSP") and the Child and Adult Care Food Program. In her role at DHS, Ms. Gentry worked to ensure the non-profit organizations that contracted with the state to participate in the food programs were using the federal funds as they were intended under the Code for Federal Regulations ("CFR").

Regarding the SFSP, Ms. Gentry stated that non-profit organizations, including churches, school systems, county governments, and libraries often participated in the program and that its purpose was to provide food—breakfast, lunch, supper, and snacks—to children in areas of high poverty. Ms. Gentry explained that Shelby County was one of the counties targeted by the SFSP because of the high number of children living at or below the poverty line.

Ms. Gentry testified that Kingdom Dominion World-Wide Ministries, Incorporated ("Kingdom Dominion")—a church associated with Defendant—applied to be a first-time sponsor in the SFSP in 2014. Ms. Gentry identified an application and provider agreement completed by Kingdom Dominion dated June 17, 2014. The application indicated that Defendant's son, Demario Jives, was the intended administrator of the food program; the application also contained a proposed budget from Kingdom Dominion, which DHS approved. Ms. Gentry explained that, if a program sponsor

---

[2] Ms. Gentry testified that she had been the acting director or "coordinator" of the food programs from December 2013 until July 2014.

wanted to change its budget, it needed to notify DHS and file an up-to-date budget. She stated that there were never any budget changes made by Kingdom Dominion. Ms. Gentry stated that, after DHS approved Kingdom Dominion's application, it provided Kingdom Dominion with policy information, including a link to the CFR.

Ms. Gentry testified that, under the provider agreement, Kingdom Dominion was supposed to operate its food program from June 1, 2014, to August 31, 2014. Kingdom Dominion agreed to provide DHS with documents regarding its costs, including receipts, invoices, and any other documentation requested. Ms. Gentry explained that the representative for Kingdom Dominion named on the provider agreement was Demario Jives, who was listed as the church's president. She stated that Kingdom Dominion was supposed to operate the program at three different sites—Kingdom Dominion, The Faith Center, and God's Ministries Christian Church.

Ms. Gentry explained that DHS would not have approved the application for a new program sponsor if it had learned that the representative signing the agreement had been previously terminated from a food program or deemed to have been "seriously deficient." However, in 2014, there was no database to check whether applicants had been previously deemed seriously deficient in any other program.

Ms. Gentry testified that all SFSP program sponsors were monitored, and new program sponsors, like Kingdom Dominion, went through "pre-operational training." Ms. Gentry explained that, during pre-operational training, DHS staff met with program sponsors to go over program requirements. Thereafter, a new program sponsor would be reviewed during its first week of operation and then monitored randomly on site to ensure compliance. Ms. Gentry explained that monitors would review program sponsors' menus and "make sure the children were offered milk." Ms. Gentry testified that she met Demario Jives and Defendant when they attended pre-operational program training in Memphis on May 16, 2014.

Ms. Gentry explained that, once a program sponsor had gone through the application process and been accepted, the program sponsor could request an advance payment for June based on its submitted budget. She stated that, in order to receive an advance payment for July, the sponsor had to submit a claim for reimbursement for the month of June—based on how many meals the program sponsor had served—that showed that the bulk of the advance for the month of June "had been paid back."

Ms. Gentry explained that DHS made advance payments to program sponsors through direct deposit and that the payment system was automated. She stated:

[T]he system . . . would calculate the number of meals that you said you served, the . . . number of sites—all of that information; and it would determine, then, what your reimbursement amount would be. And . . . if it was above the advance amount, the advance would be paid back and any overage would be issued to you via direct deposit. And then that would also trigger the release of July's advance.

Ms. Gentry identified a request from Kingdom Dominion for an advance payment in June, July, and August. The advance request specifically read, "In the event meals are not served in sufficient number to earn the amount of reimbursement, being advanced for both operational and administrative expenses, that portion of the unearned advanced funding will be refunded to the Tennessee Department of Human Services." Ms. Gentry testified that Kingdom Dominion received an advance payment for June in the amount of $61,096 to pay staff, buy food, and buy equipment. She stated that Kingdom Dominion was required to notify DHS in writing if the number of sites and/or the level of projected administration costs listed in the advance request changed. She stated that DHS never received such a notification from Defendant or Kingdom Dominion.

Ms. Gentry explained that the "Outreach Division" of Kingdom Dominion agreed to lease the church's premises on East Brooks Road for the purpose of the food program. Ms. Gentry identified a rental agreement, which listed Demario Jives as "President" of the "Outreach Division" of Kingdom Dominion and Defendant as "Senior Pastor" of Kingdom Dominion. The rental agreement provided, "This agreement is between Kingdom Dominion World-Wide Ministries Church and Kingdom Dominion World-Wide Ministries, Incorporated Outreach Division, Demario Jives." Ms. Gentry also identified a rental agreement between Kingdom Dominion and Down South Barbeque and Wings ("Down South Barbeque") for Kingdom Dominion's use of the restaurant's kitchen.

Ms. Gentry identified proposed menus submitted to DHS by Kingdom Dominion for June, July, and August for breakfast, lunch, supper and a snack. She testified, however, that Kingdom Dominion did not serve any meals to children for the SFSP.

On cross-examination, Ms. Gentry explained that Kingdom Dominion submitted a request for reimbursement for June in the amount of $91,000. In the claim for reimbursement, Kingdom Dominion stated that they had served 10,113 breakfasts; 10,301 lunches; 10,490 suppers; and 10,090 snacks in June. Ms. Gentry explained that the reimbursement for June was paid, and then DHS issued Kingdom Dominion the July advance through its automated system. She testified that Demario Jives was listed as the owner of the bank account into which DHS payments were deposited.

Ms. Gentry said that new program sponsors were supposed to have at least two on site visits by DHS staff during the first month of operation. Ms. Gentry explained that, although monitoring was required of all new program sponsors, monitoring was "a struggle" because DHS was understaffed, and there were many program sponsors participating across the state. Ms. Gentry stated, "And what happened a lot of times is that . . . because summer is so short, the program was over before they were able to get to monitoring."

Special Agent Charles Baker of the Tennessee Bureau of Investigation ("TBI") testified that he received a request for an investigation into Kingdom Dominion from the Shelby County District Attorney General. He explained that the investigation involved an alleged theft of over $60,000.00 from a program funded by DHS. Agent Baker needed to account for $162,165.89 given to Kingdom Dominion by DHS and to understand how the money was spent. Agent Baker testified that, based on his investigation, the money was not used for the purpose of the SFSP.

Agent Baker recalled that Kingdom Dominion subleased a barbeque restaurant, Down South Barbeque, which was near the church's physical location. Agent Baker testified that, after speaking with the owner of Down South Barbeque, he was unable to establish that Kingdom Dominion had prepared at that location.

Agent Baker identified purchase receipts from Kingdom Dominion. He testified:

> If you see the customer name, it's Kingdom Dominion World-Wide Ministries, that would actually be the purchaser of these food products such as the eighty quart or gallons of milk, seventy -- it looks like loaves of bread. And I don't know the number of fruit juice, but . . . what's interesting, which didn't make any sense to me is that this was purchased from Kingdom Dominion World-Wide Ministries Church. So, they basically -- from what it look[ed] like to me, they purchased it from themselves. So, I attempted to determine whether . . . Kingdom Dominion World-Wide Ministries actually was a food distributor or a wholesaler like Sysco or -- you know, any type of food distributor.

Agent Baker explained that he found no proof that Kingdom Dominion was a food distributor or wholesaler. Agent Baker also checked with the health department and found that Kingdom Dominion did not have a food vendor license. Agent Baker stated, "No one had ever heard of this entity as a food distributor." Agent Baker explained that he spoke to individuals at Turner Dairies, which was "the big milk distributor" in Memphis, because Kingdom Dominion provided receipts showing purchases of large quantities of milk. However, Turner Dairies denied selling milk to Kingdom Dominion.

Agent Baker testified that he attempted to locate the employees listed by Kingdom Dominion on its sponsor application. He spoke to Defendant because she was listed on the sponsor application and because she attended the training provided by DHS. Agent Baker said that, in speaking with Defendant, he found "nothing to show that they were feeding anyone."

Agent Baker explained that, as part of his investigation, he went to Kingdom Dominion's physical location—an old office building in a strip mall on East Brooks Road—on December 12, 2014. The building was vacant, however. Agent Baker then subpoenaed Defendant's phone records from May 14, 2014, to June 28, 2014, to check for phone calls made by Defendant to DHS. Agent Baker explained that he was "able to isolate seventy-nine incoming/outgoing calls from May 14, 2014 [to] June 28th -- specifically, forty out-going calls were made to DHS."

Agent Baker testified that he also attempted to identify a source of income for Defendant. He checked with the United States Department of Revenue Tax System, but he could not locate any type of employment. He stated, "I tried other means . . . through other data bases to try to find income and employment for [Defendant]. I could not locate any."

Agent Baker testified that he arranged to meet with Defendant on February 4, 2015, through her probation officer. Agent Baker stated that he provided Defendant with a *Miranda* warning, and she initially refused to answer questions about the SFSP. As Agent Baker was getting ready to leave, however, Defendant said that she wished to speak to him. After signing a waiver of rights, Defendant stated that her son, Demario Jives, operated the food program for Kingdom Dominion. She stated that she was the pastor of the church. Defendant told Agent Baker that her "probation conditions" would not allow her to be involved with any government subsidized program. Defendant provided her personal cell phone number and email address. Later in the conversation, however, Defendant said that the cell phone was "the church's cell phone" and that "anyone connected to the church would have access to her telephone and email."

When Agent Baker asked Defendant to provide details about the food program, she again stated that her son operated the food program, although she acknowledged that she attended the pre-operational training. Regarding the training, Defendant stated that she was only there to "see what was going on." Defendant acknowledged that she was with her son when he negotiated the kitchen rental agreement with the owner of Down South Barbeque and when the restaurant was inspected by the DHS program inspector.

Defendant said that Kingdom Dominion prepared food at Down South Barbeque on East Brooks Road between the hours of 5:00 a.m. and 7:30 a.m., when no one else was

at the restaurant. She identified Tianna Mitchell, Christopher Covington, Hazel Keith, Henry Simmons, and another of her sons, Tamarco Jives, as individuals who had prepared food for the SFSP. Agent Baker testified that he spoke to Tamarco Jives and that the information provided by Tamarco Jives did not "support the idea that Kingdom Dominion had fed hundreds of children a day[.]"

Defendant told Agent Baker that she purchased the food for the program at Sam's Club, Walmart, Family Dollar, and Restaurant Depot in Memphis. She told Agent Baker that the food for the program was purchased using an account at Regions Bank that DHS deposited money into for use in the SFSP. When Agent Baker asked Defendant about receipts that she had given to DHS showing that Kingdom Dominion purchased food from itself, Defendant stated that program sponsor could buy food "from anyone."

Defendant claimed that all the meals were served at Kingdom Dominion on East Brooks Road. She said that "[t]he church served three meals and one snack five days a week for the months of June and July of 2014." She claimed that, on average, Kingdom Dominion had fed five to six hundred people a day. She further stated that the church had paid staff to prepare and serve the meals but that volunteers also participated. Defendant told Agent Baker that the church used money from the Regions Bank account to purchase a van, which she claimed was used to pick up children participating in the SFSP. Agent Baker asked Defendant how Kingdom Dominion paid for all the meals and expenses, and Defendant explained that DHS reimbursed Kingdom Dominion for its expenses.

Defendant told Agent Baker that Kingdom Dominion consisted of "about fifty people." She said that some of the children fed by Kingdom Dominion also attended the church with their parents; however, Defendant could not remember any of their names. Defendant claimed that Kingdom Dominion had a board of directors and that she was only the church's pastor. However, Defendant did not know the names of any of the individuals on the board.

Defendant told Agent Baker that she had received a salary and "other money" from the same Regions Bank account where the DHS funds had been deposited. Defendant stated, however, that she received no funds intended for the SFSP. She explained that the funds she received were from "donations and offerings to the church." Defendant explained that Kingdom Dominion's food program began around June 1, 2014, and the program was closed down at the end of July 2014. She stated that the program was supposed to run to August 2014, but it shut down early for "some unknown reason." Defendant recalled visits by state auditors or monitors. She explained, however, that her records for the SFSP had been destroyed by a "pipe leak" and that the damaged records had been placed in a dumpster behind the church. Defendant told

Agent Baker that a handyman from Kingdom Dominion repaired the leak, but she could not remember the man's name.

When Agent Baker asked Defendant why her cell phone number had made or received around seventy calls to the SFSP director, Ms. Gentry, Defendant stated that the number "was also the church's number" and that her son, Demario Jives, also used the cell phone. Defendant acknowledged that the number had been used as a contact number for DHS and that she had called DHS to ask questions about the SFSP. Defendant stated that she could "ask and answer questions," "without violating her probation terms."

On cross-examination, Agent Baker admitted that, in his review of the documents relating to Kingdom Dominion's participation in the SFSP, he did not find any documents signed by Defendant. He testified that he attempted to interview Demario Jives but that Demario Jives refused to speak to him.

Belinda Lawson testified that she was employed by DHS in 2014 as an administrative services assistant. In her position, Ms. Lawson provided training and technical assistance to program sponsors in the SFSP. Ms. Lawson explained that, after a program sponsor completed the application process, she would be notified that the sponsor was ready for training, and she would meet with the sponsor to ensure that it understood the requirements of the United States Department of Agriculture ("USDA"), including the record keeping requirement. Ms. Lawson stated that she did site visits all over West Tennessee and that she visited Kingdom Dominion on June 4, 2014. She recalled that the date of the visit was requested by Defendant. Ms. Lawson said the SFSP training guide was adapted from the USDA regulations manual and that the guide told program sponsors "everything they . . . need[ed] to know to operate the program."

During her site visit at Kingdom Dominion, Ms. Lawson confirmed that Kingdom Dominion had the current SFSP provider agreement on file. They had the sign for the comptroller's hot-line number posted as required. Ms. Lawson recalled that Kingdom Dominion's application stated that it would run three feeding sites. Kingdom Dominion indicated that it had procedures in place to maintain all program records and indicated that it would file all claims online in the Tennessee Food Program ("TFP"). Regarding the TFP, Ms. Lawson explained:

> It's where they can file their claims online. We had a hand out that explained how to use the system; and there was also a contact person in Nashville that helped with the TFP because that's where it was centrally located. If they had questions, they could contact Nashville or they could also file by a paper claim, but it took longer to get the reimbursements.

During the site visit, Ms. Lawson learned that Kingdom Dominion had contracted with Down South Barbeque—an existing restaurant on East Brooks Road—for use of its kitchen during early morning hours. Ms. Lawson was presented with a food permit and a health inspection report for the restaurant. Ms. Lawson viewed the kitchen to ensure it was an adequate facility with a refrigerated space and storage area for dry ingredients. She was also told that "Turner Dairy will make daily milk deliveries to the restaurant location."

Ms. Lawson testified that, the day after the site visit at Kingdom Dominion, she received an email from Defendant that stated, "Good morning, what do we do now?" Ms. Lawson replied to the email, "I also sent the form to [Ms.] Gentry in Nashville. If they have all the information from you that they need, they should send you a formal approval notice by email with an assigned application number. You need formal written notice before you can begin the program." Defendant then responded, "Okay, thanks."

Thomas Byspriansky testified that he worked as an auditor for the Tennessee Comptroller of the Treasury ("Comptroller's Office"). He explained that, as an auditor, he "check[ed] for compliance within . . . state agencies" and that he was assigned to audit DHS and the SFSP. Mr. Byspriansky stated that Kingdom Dominion was one of several program sponsors he randomly selected for review. He intended to conduct a site visit first and then an administrative review of Kingdom Dominion's food program.

Mr. Byspriansky stated that he made a phone call on July 18, 2014, to the phone number listed on the sponsor application, and Defendant answered. Mr. Byspriansky asked to speak to Demario Jives about the food program. Defendant said that he was not present but that she could answer any questions Mr. Byspriansky might have on his behalf. Mr. Byspriansky asked Defendant general questions about Kingdom Dominion's operations, like how many sites it operated, meals served, and the first day and last day of the program. Defendant was able to answer his questions. Mr. Byspriansky testified that he told Defendant that he would follow up at a later date to schedule a day when he could conduct an in-person meal observation.

Mr. Byspriansky called Kingdom Dominion on July 25, 2014, to schedule a meal observation. Mr. Byspriansky again asked to speak to Demario Jives, but Defendant said that he was not available and that she could answer his questions. Mr. Byspriansky explained that he wanted to schedule a meal observation for the following week. He said that he wanted to "come and be present when the meals are served to children." However, Defendant told him that July 25 was the last day that Kingdom Dominion was participating in the SFSP. She stated that there was "an emergency" and that she needed to leave town for two weeks. Mr. Byspriansky told Defendant that he would contact her

at a later date to schedule an administrative review so that he could look at Kingdom Dominion's documentation.

On September 5, 2014, Mr. Byspriansky called Defendant, seeking to come and review documentation supporting the payments that DHS made to Kingdom Dominion. He suggested that September 11 would be a good day, and Defendant agreed to meet with him on that date at 10:30 a.m. at Kingdom Dominion. During this phone call, Mr. Byspriansky again asked to speak to Demario Jives, but Defendant stated that he was sick and "not in the church [at] that time." On September 8, Mr. Byspriansky emailed Defendant, listing the items he wanted to review during his September 11 visit.

Mr. Byspriansky testified that he received a voice mail message from Defendant at 9:30 a.m. on September 11, one hour before their scheduled meeting. She said that there was water damage in the church, that all the documentation for the SFSP had been destroyed, and that "there was no reason for [Mr. Byspriansky] to come at [the] 10:30 meeting." Mr. Byspriansky testified, however, that he was at Kingdom Dominion at the scheduled time where he was joined by Jimmy Stewart, another auditor from his office, and Brenda Powers, a monitor for DHS. When he arrived at the church, Mr. Byspriansky saw a note on the front door that stated, "Mr. Byspriansky, I left you a voice mail early on, busted pipe damaged the documentation . . . , and I'm driving out of town from the church."

Mr. Byspriansky recalled that, around 11:00 a.m., Defendant called him. She reiterated that the documentation had been destroyed by a busted pipe. She said that all the documentation for the SFSP was placed in a dumpster behind the building. Mr. Byspriansky told her that he was at the church and asked Defendant to return. Defendant suggested that they meet another day or at another location "because she did not have the keys from the church." Mr. Byspriansky refused to meet at another location and persisted in his request that Defendant return to the church. Eventually, Defendant agreed to meet him at Kingdom Dominion.

Mr. Byspriansky explained that he waited for Defendant across the street from Kingdom Dominion. He was sitting in his car when, around 11:45 a.m., Defendant arrived at the church in a van. When he saw Defendant unlocking the front door, Mr. Byspriansky, Mr. Stewart, and Ms. Powers introduced themselves and asked Defendant if she could show them any water damage inside the building. Defendant claimed that the water damage had occurred the night of September 10 or morning of September 11 and that the busted pipe had been in the bathroom. However, Mr. Byspriansky went inside the bathroom and did not see a busted pipe or any evidence of water damage. Mr. Byspriansky stated that he touched the walls, the carpet, and went around the building "just patting the walls because [he] couldn't see any water damage[.]" Defendant pointed

in the general direction of the toilet and ceiling, but Mr. Byspriansky did not see any water stains on the ceiling. When he mentioned to Defendant that he did not see any water, Defendant stated that a crew of church members came to clean up before she left the church that day. Defendant claimed that the SFSP records had been kept in the filing cabinet in a back room, separate from the bathroom. Mr. Byspriansky testified that he looked inside the filing cabinet and found it empty.

Because Defendant had stated that the documentation had been placed in the dumpster behind the church, Mr. Stewart and Mr. Byspriansky inspected the dumpster. Mr. Byspriansky said that the only thing he saw inside the dumpster was "tree branches [and] leaves[.]" When Mr. Byspriansky told Defendant that he and Mr. Stewart looked in the dumpster for the records but did not find any, Defendant responded that "it was a far-away dumpster."

Mr. Byspriansky explained that he interviewed Defendant using an "internal control questionnaire," which he used for interviewing each of the sample sponsors. Defendant stated that, "[d]uring summer, 2014, Kingdom Dominion . . . planned to serve meals at three different locations[.]" Defendant acknowledged, however, that meals were served only at the Kingdom Dominion site on East Brooks Road. Defendant told Mr. Byspriansky that Kingdom Dominion made a media release concerning the SFSP and stated that she sent the release to three different media outlets. Defendant told Mr. Byspriansky that Kingdom Dominion prepared meals at Down South Barbeque on East Brooks Road. She stated that church staff prepared the meals and that a driver delivered the ready to serve meals to the church for breakfast, lunch, afternoon snack, and supper. Defendant stated that she prepared a menu in accordance with USDA guidelines; she sent the menu to DHS at the beginning of the summer of 2014, and DHS approved it. She added that she provided "a close oversight during the meal preparation process." Defendant stated that Kingdom Dominion used "meal count sheets to record the number of meals served daily to children[.]" During the interview, Defendant did not mention anything about Demario Jives' role in the program.

Defendant told Mr. Byspriansky that her title was "pastor and program administrator[.]" She stated that she oversaw the "summer food program at [Kingdom Dominion]." Defendant stated that Kingdom Dominion did not contract with any food vendors but that she purchased food for the SFSP at various grocery stores—mostly Sam's Club and Walmart. Defendant said that she tallied up the daily meal count numbers and filed the claims in the TFP. She explained that she did not presently have any supporting documentation for the SFSP due to the water damage. She added that she maintained some of the SFSP information on her computer but that it had "crashed" a few days before the meeting with auditors. She stated that only she and Demario Jives had access to the documentation. Defendant acknowledged that only Demario Jives had

- 12 -

authorization to submit claims for reimbursement to DHS, but she admitted that she submitted the claims in the TFP.

Defendant told Mr. Byspriansky that she had been a pastor for "upwards of ten years" but that she established Kingdom Dominion in May 2014. Defendant listed the following individuals as employees of Kingdom Dominion's food program: Demario Jives, Program Supervisor; Tianna Mitchell, Helper; Tamarco Jives, Helper; Page Lakeith, Helper; Christopher Covington, Monitor; Henry Simmons, Administrative Help. Defendant said that DHS program personnel could "do a better job by training individual sponsors in the program requirements" and that additional technical assistance "could be beneficial[.]"

Samuel Wilkes testified that, when he met Defendant in 2014, he owned Down South Barbeque. Mr. Wilkes recalled that Defendant had a church in close proximity to his restaurant and that she occasionally ate at the restaurant. He identified the kitchen rental agreement between Kingdom Dominion and Down South Barbeque containing his signature. He explained that Defendant said she was applying for a grant to provide meals to children and that she needed a facility where she could prep food for serving. Mr. Wilkes recalled that he was at the restaurant when Defendant met with a DHS representative from Nashville. He stated, "And they came and they communicated there, and they wanted to see the copy of the health department inspection . . . certificate[.]" Defendant later told Mr. Wilkes that Kingdom Dominion's application had been approved.

Mr. Wilkes testified that he rented the facility to Defendant for six hundred dollars a month and provided her with a key to the restaurant. He explained that Defendant was supposed to use the restaurant's kitchen from 5:00 to 7:00 a.m. and that he normally opened his restaurant at 11:30 a.m. Mr. Wilkes explained that he cleaned the kitchen every night and that he ran the restaurant six days a week, Monday through Saturday, during the summer of 2014. When asked if he ever saw signs that the restaurant had been used in the mornings prior to his arrival, Mr. Wilkes replied, "I can't say that [Defendant] wasn't there, but the place was immaculate" and that "everything was the way I left it" the previous night. Mr. Wilkes stated that he never saw dry or refrigerated goods stored in the restaurant that did not belong to Down South Barbeque. Mr. Wilkes explained that Down South Barbeque had a dumpster, but he never saw any garbage in it that did not belong to his restaurant.

Jimmy Stewart testified that, in 2014, he was employed by the Comptroller's Office as a legislative auditor with the division of state audit. Mr. Stewart recalled that he was involved in the audit conducted on Kingdom Dominion. He explained that he went with Mr. Byspriansky to Kingdom Dominion in September 2014, in order to review

the documentation that Kingdom Dominion was required to keep in support of the claims Defendant submitted to DHS. On September 11, 2014, Mr. Stewart arrived with Mr. Byspriansky and Ms. Powers at Kingdom Dominion. He noted that Defendant was not there and that a note was on the door stating that "there was water damage[.]" After Mr. Byspriansky called Defendant, she agreed to return to the church but told him that the SFSP documentation had been damaged and that there had been "a busted pipe." Defendant said that she placed the documentation in a dumpster next to the building. Mr. Stewart explained that there was only one dumpster next to the building where Kingdom Dominion was located, so he climbed into the dumpster to look for Kingdom Dominion's water-damaged documentation. Mr. Stewart testified, however, that he found no such documentation.

Mr. Stewart explained that Defendant walked them through the church to a back room where she claimed she had kept the SFSP documentation. Defendant said that she kept the documents in a filing cabinet but that the water had damaged the documents inside. When they asked Defendant about the location of the busted pipe, she pointed to the bathroom. Mr. Stewart went inside the bathroom and took photographs of areas in the room; however, he saw no evidence of water damage.

Mr. Stewart testified that he and Mr. Byspriansky went through the internal control questionnaire with Defendant. Defendant acknowledged that Kingdom Dominion's sponsor application stated it would operate three feeding sites but that it only operated one site. Defendant said that she submitted a menu to DHS, which had been approved, and that they prepared meals at a barbeque restaurant down the street from the church. She stated that she did not have a contract with any food vendors. Instead, she went to Sam's Club and Walmart to purchase the food needed for the SFSP and tried to find the cheapest prices. Defendant said that "[c]hurch staff" prepared the food. Defendant acknowledged that she submitted the claims to DHS in the TFP on behalf of Kingdom Dominion. After completing this questionnaire, Mr. Stewart interviewed Defendant. He asked Defendant if she was aware of fraud that had occurred, is occurring, or will occur either within the program or a department in general. Defendant said that she was not aware of any fraud that had occurred. Defendant said that she maintained some additional documentation on her computer but that it "crashed" a few days before the meeting.

Mitchell Garrett testified that, in 2014, he and his wife owned a house in Cordova, which they had purchased as an investment. Mr. Garrett remodeled the house and eventually listed the house for sale. Defendant and Demario Jives answered an advertisement on the property. Mr. Garrett recalled that, on July 8, 2014, Defendant, Demario Jives, and Defendant's mother came to see the house with an interest in purchasing it. Defendant explained that she was living with Demario Jives in a small

place and that they needed a larger home. Mr. Garrett told Defendant that she needed a mortgage company, but she explained that her credit was "not that good." Mr. Garrett said that he would consider owner-financing if she provided ten percent down toward the purchase of the house. He explained that the house was listed for $149,900, so Defendant needed $15,000 as a down payment. Mr. Garrett explained that, before he agreed to finance the mortgage for Defendant, he had her fill out a credit application. On the application, Defendant listed Kingdom Dominion as her place of employment, stated that she had been employed there for five years, and claimed that she made $4,800 a month. Mr. Garrett stated that he made the decision to finance the mortgage "based on the [$]4,800 . . . based on five years of being stable, and then based on the credit information [he] got back from looking at her credit bureau." Mr. Garrett stated that he primarily negotiated with Defendant. Mr. Garrett noted that Defendant had been trusted by many state officials and had been given multiple student loans; she had a small auto loan that she was current on and no credit cards. Mr. Garrett testified that he asked Defendant for a pay stub, which she provided. Mr. Garrett explained that he later discovered Defendant had created the pay stub on a computer.

Mr. Garrett stated that, based on Defendant's supposed income, her credit application, and her demeanor, he agreed to owner-financing on a twenty-year mortgage. Mr. Garrett prepared a contract for purchase of the house, which listed the parties to the contract as Mr. Garrett, his wife, and Defendant. He testified that Defendant signed the contract. Mr. Garrett then called a closing attorney to create a mortgage note stating that Defendant would be financing it for twenty years on a six percent interest rate. He explained that the closing on the house occurred on July 11, 2014. He explained that Defendant paid the $15,000 down payment and that he financed for her the remaining $136,697.46. Defendant was supposed to begin making monthly payments of $979.34, starting August 11, 2014.

Mr. Garrett recalled that Defendant would personally deliver the monthly payments to him. He testified that Defendant paid the mortgage for eight months and then stopped paying. Defendant arranged for a mortgage company to contact Mr. Garrett, which informed Mr. Garrett that Defendant was attempting to refinance the loan. Mr. Garrett stated that he did not deal with Demario Jives regarding the house until Defendant attempted to refinance and stopped making mortgage payments. He said that, about a year after the purchase of the house, Demario Jives presented him with a cashier's check for $3,000 and another cashier's check for $1,500. He explained that the checks were an attempt by Demario Jives to "save his mother's house[.]"

Phillip Job, an investigator for the Comptroller's Office, testified that he became involved in an investigation involving Kingdom Dominion after Mr. Byspriansky requested assistance. Mr. Job stated that he attempted to obtain supporting

documentation on Kingdom Dominion from DHS but that there were no "receipts for purchases . . . [or] child count sheets[.]" He stated, "I did get some invoices from [DHS], but they were not particularly helpful. They were . . . kind of template invoices -- the kind that you could make on your computer, and they didn't have like a vendor that I could go check with like a [Walmart]." He testified that he found no documentation that Kingdom Dominion bought food for the SFSP.

Mr. Job requested that Agent Baker be assigned to work with him on the investigation. Mr. Job testified that Agent Baker subpoenaed Kingdom Dominion's bank records from Regions Bank. He stated that, in looking at the bank records, he did not find any "commercial volume of purchases" of food. He explained, "There were some debit-card purchases at places where you buy food like at Kroger or [Walmart] . . . but they were not . . . hundreds of dollars." He further stated that the bank records did not reflect purchases similar to what Kingdom Dominion listed on the invoices it provided to DHS. Mr. Job found that there were a lot of large cash withdrawals from the Regions Bank account. He saw "a sizeable amount of money going to [Defendant]." Mr. Job explained that Agent Baker also subpoenaed Defendant's personal bank records from Sun Trust Bank. In his review of Defendant's Sun Trust Bank account, Mr. Job did not find any indication of larger-volume purchases of food.

Regarding Kingdom Dominion's Regions Bank account, Mr. Job stated that the account was opened with $100 on April 11, 2014. There were only a few deposits from then through June 16, 2014, and then there was a deposit of $52,711, which was part of an advance payment from DHS. Kingdom Dominion then received another deposit of $8,385 from DHS for the administrative portion of the advance. On July 15, 2014, there was a deposit from DHS in the amount of $39,973, which was the "reconciled amount" after Kingdom Dominion claimed, "'We served more food than we thought or there were more kids than we thought,' and so they got an extra check to . . . add to their advance[.]" On July 16, 2014, Kingdom Dominion received another advance payment and administrative advance payment identical to the payments in June. Mr. Job noted additional deposits made into the Regions Bank account through December 2014. He explained that there was $171,286.34 that went into the bank account and that $162,165 was from DHS for the SFSP. In other words, there were deposits totaling $9,120.25 that were not from the state.

Mr. Job testified that, after the first advance payment to the Regions Bank account from DHS in June, there were two checks written to Defendant, one for $8,610 and the second for $2,080. He stated that, in July, there were multiple cash withdrawals from the account in the amounts of $9,500; $9,000; $5,000; $2,500; and $2,500. On July 15, 2014, Defendant received a check for $8,678.42; Defendant received a second check for $3,978.42 on the same day with the memo line stating "Tithe/seed."

- 16 -

Mr. Job testified that the checks and cash withdrawals from the Regions Bank account totaled $148,874.84. He explained that there had been a total of $89,000 in cash withdrawals, with $25,000 of that being transferred "to some sort of savings account." Additionally, $21,950 was taken out of the account through debit card transactions. He said that Defendant received checks totaling $38,446.42 from the account, and Demario Jives received two checks totaling $10,500.

Mr. Job stated that he looked to see if any of the cash withdrawals from the Regions Bank account "corresponded or matched up with any deposits of cash into [Defendant's] personal bank account." He explained that on June 24, 2014, Defendant received a check in the amount of $8,610 from the Regions Bank account, which she cashed at Regions Bank. Then, about an hour later, Defendant deposited the money into her Sun Trust Bank account. On July 9, 2014, there was a cash withdrawal from the Regions Bank account of $9,500. The following day, Defendant deposited $9,000 into her Sun Trust Bank account.

Mr. Job stated that he prepared a schedule relating to all of the debit card transactions for the Regions Bank account so that he could "look for food type purchases from food vendors[.]" Mr. Job explained that "out of the life of the [debit] card," which ran from April 2014 through November 2014, there were purchases at places that sold food totaling $5,539.94. However, during the time that Kingdom Dominion was supposedly running the SFSP in June and July of 2014, there were only $2,343.13 in purchases made at locations that sold food.

Mr. Job testified that, although Kingdom Dominion ended its food program around the end of July 2014, there continued to be cash withdrawals from the Regions Bank account. He stated that, on August 1, 2014, there was a transfer withdrawal from the Regions Bank account of $25,000 that went into a savings account. Additionally, there was a cash withdrawal of $5,500 on August 1, 2014. Then, on August 21, 2014, Defendant received a check for $5,185.26. A week later, there was another cash withdrawal of $5,500 made from the Regions Bank account. Mr. Job stated that, after Kingdom Dominion closed the SFSP, a total of $45,000 was taken out of the Regions Bank account. He testified that, in total, Kingdom Dominion received $162,165 from DHS for the SFSP.

Mr. Job recalled that he met with Defendant, along with Agent Baker and Defendant's probation officer. Initially, Defendant said that she did not want to discuss the SFSP. However, as he and Agent Baker began to leave, Defendant "changed her mind and told Agent Baker that she wanted to talk . . . ." Defendant told Mr. Job and Agent Baker that she was "just the pastor of the church," that she did not do anything for the SFSP, and that she "didn't know anything about it." Defendant provided her cell

phone number and email address. She told them that the records for the program had been destroyed and placed in a dumpster by the church building. She also stated that the church was run by a board of directors but said that she did not know the names of any of the board members. Defendant stated that she "got paid through donations or church money; not through any of the [SFSP] grant money[.]" Mr. Job explained that he had already looked at the Regions Bank account and knew that Defendant's statement was not accurate because there were checks made payable to Defendant from that account. Mr. Job explained that there had been only $9,000 in "non-state money" come in to the church but that Defendant was paid $38,000 in checks directly to her. Mr. Job stated, "So, right there, . . . you're almost at [$30,000] that has to be state money[.]" During the interview, Defendant told Mr. Job that "they paid cash for a van to bring kids to the feeding sites." Mr. Job testified, however, that his investigation showed the van was not registered until sometime in August 2014, after the program had ended.

Defendant's Proof

Demario Jives testified that he was thirty-four years old and that Defendant was his mother. He said that he was "a part of and running" Kingdom Dominion in 2014. He stated that he took care "of the money, the books, and the rent" for the church. He explained that Kingdom Dominion had been in existence for about fifteen years but that it had been previously located in Florida and that the church was eventually relocated to Memphis. He stated that he was on the board of directors for Kingdom Dominion, along with his grandmother and brother. He could not recall the names of any other board members. Mr. Jives stated that he enrolled the church in the SFSP and that it had been his idea for Kingdom Dominion to participate in the food program.

Mr. Jives agreed that he signed the SFSP application and provider agreement as the president of Kingdom Dominion. Regarding the individuals that he listed on the application as personnel responsible for administering the SFSP, Mr. Jives identified one of the individuals, "T. Jives," as his brother and another individual, "T. Mitchell," as a family member. He agreed that, on the application, he calculated the personnel's total salary at $42,644; he claimed that he paid Kingdom Dominion's personnel that total salary in cash. He stated that he could not recall if he withheld taxes.

Mr. Jives said that Kingdom Dominion spent $150,000 on food during its operation of the SFSP. He stated that Kingdom Dominion purchased their food from Walmart and Sam's Club. When asked for an example of one of the lunch menus served to the children, Mr. Jives stated that Kingdom Dominion served "meatloaf, broccoli, bread, apple juice." He stated that the meatloaf had been prepared in the kitchen at Down South Barbeque. He stated that they served about 400 meals at breakfasts, snacks, and dinners, for approximately 1,600 meals a day. He explained that the food was

transported from Down South Barbeque to Kingdom Dominion by use of the church's van. He said that he could not recall the names of any of the children in the program.

Mr. Jives stated that he prepared all of the claims for reimbursement that were submitted to DHS. He said that he submitted invoices for milk and other items to DHS. Mr. Jives explained that he would send DHS invoices for food that he had already purchased and then get reimbursed by DHS. Mr. Jives agreed that, when he met with Ms. Lawson on June 4, 2014, he told her that he understood what was required to participate in the program and that Kingdom Dominion was required to maintain its records relating to the SFSP. Mr. Jives agreed that he conducted training for Kingdom Dominion's personnel stating, "I instructed our people on what they should do as the best as I [knew] how to . . . while we waited for the feeding program to come out to give us further instructions." He testified that DHS conducted no real training for the SFSP. He stated that he alone was responsible for the management and running of Kingdom Dominion's food program. Mr. Jives stated that he participated in preparing the food at Down South Barbeque and that he was on site while meals were distributed at Kingdom Dominion. He stated that he notified DHS of the change in the number of sites that Kingdom Dominion was going to run.

Mr. Jives acknowledged that Kingdom Dominion was supposed to serve milk to the children at breakfast, lunch, and supper. He stated that he purchased milk at Walmart by the gallon. He testified that the milk was stored in the refrigerator at Down South Barbeque and at the church. He claimed that any left-over food was stored in the refrigerator at Down South Barbeque and that the food took up "[a] lot" of room. Mr. Jives stated that Kingdom Dominion used the dumpster at Down South Barbeque and agreed that the items thrown out would "take up a lot of space[.]"

Mr. Jives said that he was the only person with the authority to take money out of the Regions Bank account. He claimed that he made all of the phone calls to DHS listed in Kingdom Dominion's cell phone records. When shown a document that stated "Received from Kingdom Dominion . . . this amount for purchases[,]" the following exchange occurred:

[DEFENSE COUNSEL:] But this is saying, "Received from Kingdom Dominion," this amount for purchases.

[MR. JIVES:] Um-hum.

[DEFENSE COUNSEL:] It's signed by who?

[MR. JIVES:] It looks like my mother's name.

[DEFENSE COUNSEL:]  Whose handwriting is this?

[MR. JIVES:]  I'm not sure because I had someone there helping me doing this?

[DEFENSE COUNSEL:]  Who?

[MR. JIVES:]  I don't remember right now.

Mr. Jives later said that the handwriting in the document was Defendant's but stated that it was his document.  Mr. Jives then claimed that he signed Defendant's name on the "received from" receipts "[b]ecause she would normally be there sometime, and so [he] just put her name on there."

Mr. Jives admitted that he wrote Defendant checks out of the Regions Bank account.  He stated that the check for $8,610 was for a loan; he said that Defendant had loaned money to Kingdom Dominion for "some of the repairs and things[.]"  Mr. Jives said that he gave Defendant the church's "offering" money of $4,000 from the Regions Bank account.  He stated that Defendant did not ask for the money but earned it during her work as a traveling minister.  Mr. Jives agreed that there was never $38,000 put into the Regions Bank account by tithing donations or people at the church.

Mr. Jives stated that he had the debit card and checks for the Regions Bank account and that all the money that went into that account was under his exclusive control.  He claimed that he had maintained all the proper documentation but that there had been a water leak in the church at the front of the building where the office was located.  He explained that he had stored the documents relating to the SFSP "in boxes in the drawers" of a desk inside the office.  He stated that, due to the water leak, the documents were "smeared . . . everything was wet and there was like nothing [he] could do at this point[,]" so he threw the documents into the dumpster behind the church.

Mr. Jives testified that all of the money given to Kingdom Dominion by DHS was spent on the SFSP and went towards feeding children.  Mr. Jives denied that Defendant talked him into running the SFSP through Kingdom Dominion, and he denied that she told him how to run the program.  He agreed that Defendant went to "an informative meeting" about the program but stated that Defendant could not be involved in any programs like SFSP because she was on probation.  This colloquy followed:

[DEFENSE COUNSEL:]  She couldn't be involved in any kind of boards, right?

- 20 -

[MR. JIVES:]  Um-hum.

[DEFENSE COUNSEL:]  Is that a yes?

[MR. JIVES:]  Yes.

[DEFENSE COUNSEL:]  She couldn't be involved in non-profits?

[MR. JIVES:]  Um-hum.

[DEFENSE COUNSEL:]  Right?-- yes?

[MR. JIVES:]  Yes.

Mr. Jives acknowledged that he had been ordered to pay back $164,000 to DHS after a hearing because he had no records regarding how the funds were spent.  He stated that he had not paid back any of the money owed but that he planned on paying it back in the future.  He stated that all of the checks written out of the Regions Bank account had his handwriting and signature on them.

When asked who carried the church's cell phone, Mr. Jives said, "It just depended. Because, again, this is the church number, so it just depends."  He could not recall if he had arranged the September 11th meeting with Mr. Byspriansky but then stated that he asked Defendant to go to the meeting.  Mr. Jives said that he instructed Defendant to call him to get answers to any questions Mr. Byspriansky might have, which Defendant did. He claimed that he gave Defendant answers to their questions over the phone.

Following deliberations, the jury found Defendant guilty of theft over $60,000 and money laundering.

*Sentencing*

At a subsequent sentencing hearing, the State introduced Defendant's presentence report, showing that Defendant was previously convicted in Florida of grand larceny in 2007 and "fraud-swindle" in 2011.  The State submitted an order from the 10th Judicial Circuit Court for Polk County, Florida, granting Defendant post-trial release and proof that Defendant had previously violated probation.

Mitchell Garrett explained that his trial testimony had concerned Defendant's purchasing a house and the documents that she had presented to him to convince him to loan her money.  When asked about Defendant's honesty, Mr. Garrett stated that

Defendant had "unbelievably manipulated and perjured herself in every setting that [he had] been in and every courtroom." Mr. Garrett explained that he loaned Defendant money based on fraudulent documents that she provided to him. He stated that she had been incarcerated in Florida "for doing the same exact thing there" and that she "got Florida to give her over $200,000 to feed hungry, disabled children."

Mr. Garrett testified that after Defendant stopped making the mortgage payment, he attempted to foreclose on the house. On the day of the foreclosure hearing, Mr. Garrett received a text message from Defendant stating, "I filed Chapter 13." Mr. Garrett stated that he had to go to court every two to three weeks due to bankruptcy and foreclosure hearings because Defendant filed for Chapter 13 three times. Demario Jives eventually came to Mr. Garrett and offered to pay him $6,000 to "catch up all the back payments." Mr. Garrett agreed, but Mr. Jives never paid him. Mr. Garrett testified that, after four attempts, he was able to foreclose upon the house on July 1, 2017, due to Defendant's failure to pay her mortgage. He gave Defendant ten days to move out of the house, but she refused.

Mr. Garrett testified that he attempted to insure the house through his insurance company, but he learned that he had to cancel the original insurance policy first. When he tried to do that, he learned that Defendant had taken his name off the policy on June 27, 2017. While attempting to get his name reinstated on the policy, Mr. Garrett learned that there had been a claim filed on the policy for $5,000 due to a fire at the house and that Defendant had received $5,000 from the insurance company. Mr. Garrett drove to the house and found that "[t]he whole back of the house was burnt out. The master bedroom, master bath, hall bedroom, smoke damage. Everything in the house was completely blackened." Mr. Garrett explained that Defendant later claimed Mr. Garrett set the fire to the house, and he had to hire an attorney to defend himself against a suit filed by Defendant for wrongful foreclosure. Mr. Garrett stated that he spent $100,000 on repairs following the fire damage to the house. He explained that Defendant also owed him $138,000 on the mortgage and stated that he had spent about $30,000 in litigation with Defendant.

Defendant made an allocution statement in which she maintained her innocence and stated that she forgave Mr. Garrett for "the things he did to [Defendant's family]."

In sentencing Defendant, the trial court considered as enhancement factors: that Defendant had a previous history of criminal convictions or criminal behavior; that she was a leader in the commission of an offense involving two or more actors; and that the offense involved more than one victim, reasoning that the citizens of Shelby County and "every child that should have received the benefit of what [Defendant] was supposed to do with the money" were victims. Additionally, the trial court found that what Defendant

did to Mr. Garrett was "exceptionally cruel," stating "[I]t was his house and . . . he had to evict her from it and then she burns it. There's no doubt in my mind . . . it was a big scheme to collect money." The trial court also found that, before trial, Defendant had failed to comply with conditions of a sentence involving a release in the community; that, at the time the felony was committed, Defendant was released on probation; and that Defendant abused a position of trust based on her position as a pastor. The court stated that it placed "great weight" on enhancement factor 1. Regarding mitigating factors, the trial court determined that no mitigating factors applied. The trial court further stated that Defendant's allocution statement was "the worst allocution I've ever heard." The trial court also found that Demario Jives was "undoubtedly the biggest liar I've ever seen, perhaps next to [Defendant]."

The trial court sentenced Defendant, as a Range I standard offender, to twelve years on each count. The trial court found that Defendant was a professional criminal who had "knowingly devoted her life to criminal acts as a major source of her livelihood" stating, "I've never seen a more professional criminal in my [twenty-eight] years of doing this job." The trial court also determined that Defendant was a dangerous offender, stating that the circumstances surrounding the offenses were "particularly aggravated." The trial court ordered the sentences to run consecutively for a total effective sentence of twenty-four years to serve in the Tennessee Department of Correction.

*Restitution*

Defendant filed a timely motion for new trial, followed by an amended motion for new trial.[3] Prior to the hearing on Defendant's motion for new trial, the trial court held a restitution hearing. Mr. Garrett presented itemized receipts totaling expenditures of $172,370.82 to repair and maintain the house, as well as to get up-to-date with all city and county taxes. However, he did admit that the insurance company settled its policy by giving $112,500 to both Defendant and Mr. Garrett in exchange for release from civil liability. The State argued that Defendant "does have the skill and ability to make money apparently by preaching and actually operating a church," and the trial court noted that "she has a bank account with $112,500 in it." It further stated that, even in prison, "she has access to a computer . . . she'll be able to figure out some way to make some money no doubt in my mind." The trial court ordered Defendant to pay $162,165.89 in restitution to DHS in count one (theft over $60,000) and $172,370 to Mr. Garrett in count two (money laundering). The trial court denied the motion for new trial in a written order after a hearing. This timely appeal follows.

---

[3] The transcript of the motion for new trial hearing references an amended motion for new trial filed the day of the hearing. That motion, however, does not appear in the appellate record.

## II. Analysis

### *Sufficiency of the Evidence*

Defendant contends that the evidence presented at trial is insufficient to support her convictions for theft over $60,000 and money laundering. She asserts that the State failed to establish that she exercised or obtained control over the money given to Kingdom Dominion by DHS and that the uncontroverted proof showed that Mr. Jives applied to the SFSP and that he exclusively owned and controlled the Regions Bank account into which DHS deposited the program funds. Defendant further asserts that the State failed to present any evidence that Defendant's purchase of Mr. Garrett's house was done with the requisite intent for a conviction for money laundering. The State responds that the proof at trial overwhelmingly supports Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Defendant was indicted for theft of property over $60,000. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2014). In its charge to the jury, the trial court provided the instruction for criminal responsibility, which provides that "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2014). As pertinent here, "[a] person is

criminally responsible for an offense committed by the conduct of another, if[,] . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2014).

Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Accordingly, to establish the elements of this offense, the State had to show that Defendant—or someone for whom she was criminally responsible—knowingly obtained or exercised control over funds designated for the SFSP program by DHS, without the DHS's consent and with the intent to deprive DHS of those funds. When the evidence is viewed in the light most favorable to the State, we conclude that a rational juror could have found Defendant guilty of theft of property of the value of $60,000 or more beyond a reasonable doubt.

The State's proof established that Kingdom Dominion obtained funds from DHS in the amount of $162,165 and that the funds were intended to be used solely for Kingdom Dominion's operation of the SFSP. Further, the State established that Kingdom Dominion misappropriated those funds and failed to serve any meals to children through the SFSP. Defendant, as the senior pastor of the church, actively participated in the scheme to obtain money from DHS through Kingdom Dominion's becoming a program sponsor in the SFSP. Defendant attended pre-operational training sessions, called and emailed DHS officials about the program, and was with Mr. Jives when he negotiated the rental agreement for the supposed use of Down South Barbeque's kitchen. Defendant arranged for the Ms. Lawson's site visit at Kingdom Dominion and accompanied her when she inspected the premises of Down South Barbeque. Defendant filed the reimbursement claims in the TFP and the fraudulent purchase receipts with DHS. DHS deposited funds into the Regions Bank account based on these claims. Mr. Job testified that large amounts of money were taken out of the Regions Bank account through cash withdrawals, debit card purchases, a transfer to a separate savings account, and checks to Defendant. Defendant received $38,000 in checks written directly to her from the

Regions Bank account, and several of the cash withdrawals from the Regions Bank account were closely followed by Defendant's depositing large sums of money into her Sun Trust Bank account. During this time, Defendant gave Mr. Garrett $15,000 for a down payment on the house she purchased from him. Although Defendant claimed that she "got paid through donations or church money; not through any of the [SFSP] grant money," the State presented proof that there had been only $9,000 in "non-state money" come in to the church during this time and that Defendant had no other employment or known source of income.

When Agent Baker began asking questions about Kingdom Dominion's operation of the food program, Defendant claimed to be the program administrator and said that Kingdom Dominion prepped food at Down South Barbeque and that she purchased the food for the program. However, auditors found no evidence that Defendant or Kingdom Dominion had made purchases of large volumes of food. Moreover, the owner of Down South Barbeque testified that Kingdom Dominion stored no food at the restaurant, did not use its dumpster, and left no sign that it had prepared meals in the restaurant's kitchen. Defendant answered the phone each time that auditors called. Although Mr. Byspriansky asked to speak to Mr. Jives numerous times, Defendant made excuses as to why Mr. Jives could not speak to the auditor and insisted that she could answer his questions. It was Defendant who scheduled the September 11 meeting with Mr. Byspriansky and then claimed that all of Kingdom Dominion's documentation had been destroyed by a busted pipe the night before. When Defendant allowed the auditors into the church, they found no signs of water damage and found no damaged documentation in the church's dumpster. Ultimately, Kingdom Dominion presented no proof to auditors and investigators that any children were fed by the program.

Mr. Jives testified that he ran the SFSP for Kingdom Dominion and had exclusive control over the Regions Bank account, and he asserted that Defendant was not involved in the SFSP due to restrictions placed on Defendant by her probation. However, the jury was free to reject the testimony from Mr. Jives, whom the trial court described as "undoubtedly the biggest liar I've ever seen[.]" In any event, the jury was instructed on criminal responsibility and could have concluded that Defendant was directing and/or assisting Mr. Jives in taking money from the Regions Bank account. The evidence was more than sufficient to sustain Defendant's conviction for theft of property over $60,000.

Similarly, the evidence is sufficient to sustain the verdict of money laundering. To establish the elements of this offense, the State had to show that Defendant knowingly used proceeds derived from the theft of the DHS funds to conduct a financial transaction "with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds." Tenn. Code Ann. § 39-14-903(a)(1) (2014). The State established that, in July 2014, Defendant purchased a house from Mr. Garrett,

giving him a $15,000 down payment on the house. Defendant told Mr. Garrett that she had been employed by the church for the past five years and that she made $4,800 a month, and she provided him with a fake pay stub. Although Defendant claimed that she "got paid through donations or church money; not through any of the [SFSP] grant money," the State presented proof that there had been only $9,000 in "non-state money" come in to the church during this time and that Defendant had no other employment or known source of income. Thus, the jury could reasonably conclude that Defendant used the stolen money from DHS as the down payment on the house and that Defendant was aware that it was stolen money.

Defendant contends that the State failed to establish "the requisite intent for a conviction for money laundering[,]" *i.e.*, that she purchased the house "with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds." *Id.* However, the proof at trial demonstrated that Defendant lied to Mr. Garrett about the length of her employment with Kingdom Dominion and about her monthly income and that she provided falsified documents to Mr. Garrett in support of her claims. Given Defendant's false claims as to the source of the money, any rational trier of fact could reasonably conclude that she conducted the financial transaction with the intent to conceal or disguise the source of the criminally derived funds. The evidence is sufficient to support Defendant's convictions.

### *Severance*

Defendant also asserts that the trial court erred when it failed to sever the counts of the indictment. Defendant argues that the offenses were not part of a common scheme or plan as required under Rule 14 of the Tennessee Rules of Criminal Procedure. The State responds that Defendant waived consideration of the issue by failing to include it in her motion for new trial and that Defendant is not entitled to plain error review.[4]

We will first address the State's waiver argument. Prior to trial, Defendant requested that the trial court sever the offenses. However, the trial court found that the two charges were "totally intertwined" and that "proof of one [wa]s admissible in the other" and denied the request. Defendant filed a timely motion for new trial, but the motion did not include the trial court's failure to sever the offenses as a ground for relief. As previously noted, the transcript of the motion for new trial hearing references an amended motion for new trial filed the day of the hearing. That motion, however, does not appear in the appellate record, and Defendant did not argue the issue of severance during the motion for new trial hearing. Accordingly, we agree with the State that Defendant has waived our review of the issue. *See* Tenn. R. App. P. 3(e), 36(a); *State v.*

---

[4] Defendant has not responded to the State's assertion that she waived this issue.

- 27 -

*Harbison*, 539 S.W.3d 149, 164 (Tenn. 2018) ("Grounds not raised in a motion for new trial are waived for purposes of appeal."); *Spicer v. State*, 12 S.W.3d 436, 444 n. 7 (Tenn. 2000); *State v. Barbara Mae Potter*, No. E2015-02262-CCA-R3-CD, 2019 WL 453735, at *39 (Tenn. Crim. App. Feb. 5, 2019) ("Defendant did not raise this [severance] issue in the motion or in an amended motion for new trial. By failing to include this issue in her motion for new trial, Defendant has waived plenary review of the issue."), *no perm. app. filed*.

"[W]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). The defendant bears the burden of persuading this court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial. *State v. Bledsoe*, 226 S.W.3d 349, 354-55 (Tenn. 2007). Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007).

Defendant has not shown that the trial court breached a clear and unequivocal rule of law. Rule 14 of the Tennessee Rules of Criminal Procedure provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). Here, the trial court determined that Defendant's two offenses were "totally intertwined" and that the proof of one would have been admissible in the trial of the other. The trial court reasonably determined that Defendant was not entitled to a severance because the offenses were part of a common scheme or plan and the evidence of one would be admissible in the trial of the other. Thus, plain error relief is not warranted.

### *Rule 404(b)*

Defendant asserts that the trial court erred in allowing the jury to hear about prior bad acts pursuant to Rule 404(b) of the Tennessee Rules of Evidence, arguing that the trial court failed to determine that the probative value of the evidence was outweighed by the danger of unfair prejudice. She contends that, although the State limited its proof to the fact that Defendant was on probation and the terms of that probation, the evidence "implie[d] that the Defendant ha[d] been convicted of a crime[.]" She asserts that this

created "an improper impeachment situation" because it allowed the State to attack Defendant's credibility under Tennessee Rule of Evidence 609 despite Defendant's not testifying. Defendant contends that the trial court's ruling was "an end run around the requirement that in order to attack her with her prior conviction [Defendant] must make herself a witness." The State responds that the trial court properly exercised its discretion in admitting evidence of Defendant's probation under Rule 404(b).

Generally, this court reviews a trial court's decision to admit evidence based upon its relevancy under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Likewise, when such evidence is offered under Tennessee Rule of Evidence 404(b) and the trial court has "substantially complied" with the procedural requirements in that rule, we review the trial court's decision under an abuse of discretion standard. *Id.* We will reverse the trial court's decision "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of

exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). "In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background." *State v. Montgomery*, 350 S.W.3d 573, 583 (Tenn. Crim. App. 2011) (citing *Gilliland*, 22 S.W.3d at 272); *see also* Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story").

Here, the trial court complied with the prerequisites of Rule 404(b) and specifically determined that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Because the trial court substantially complied with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1990)). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015).

We agree with the State that the evidence of Defendant's probation and probation conditions were undoubtedly probative to help explain the added involvement of Defendant's son. Moreover, because the nature of Defendant's underlying conviction was never revealed, the danger of unfair prejudice was drastically reduced. Thus, the trial court's ruling does not amount to an abuse of discretion.

Defendant contends that the trial court's ruling created "an improper impeachment situation" under Rule 609 of the Tennessee Rules of Evidence because it allowed the State to attack Defendant's credibility despite Defendant's not testifying. We disagree. Because Defendant did not testify, the State could not impeach her testimony with evidence that she was on probation. Instead, the evidence of Defendant's probation and the probation conditions was properly admitted under Rule 404(b), as substantive evidence, to explain Demario Jives' involvement in the offenses, not as impeachment evidence under Rule 609. Defendant is not entitled to relief.

### *Sentencing*

Defendant next contends that the trial court abused its discretion when it sentenced Defendant to the "maximum on each count" and ordered Defendant's sentences to run

consecutively.  The State replies that the trial court properly exercised its discretion in sentencing Defendant to an effective sentence of twenty-four years.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'"  *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing.  *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013).  A trial court "may order sentences to run consecutively" if it finds that the defendant is "a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood[.]"  Tenn. Code Ann. § 40-35-115(b)(1) (2018).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing.  *See* Tenn. Code Ann. § 40-35-210 (2018); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).  The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed.  Tenn. Code Ann. § 40-35-103 (2018).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen.  Tenn. Code Ann. § 40-35-210(e) (2018; *Bise*, 380 S.W.3d at 706.  The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper.  Tenn. Code Ann. § 40-35-401 (2018), Sentencing Comm'n Cmts.

Theft of property is "[a] Class B felony if the value of the property or services obtained is sixty thousand dollars ($60,000) or more[.]" Tenn. Code Ann. § 39-14-105(a)(5) (2018). The sentence range for a Range I, standard offender, convicted of a Class B felony, is not less than eight nor more than twelve years. *See* Tenn. Code Ann. § 40-35-112(a)(2) (2018). Within-range sentences that are supported by the record and reflect that the trial court properly applied the purposes and principles of sentencing are reviewed for an abuse of discretion, with a presumption of reasonableness. *Bise*, 380 S.W.3d at 707-08. In this case, the trial court considered the factors set out in section 40-35-210 and stated on the record the reasons for the sentence it imposed. Thus, the trial court's sentencing decisions are entitled to a presumption of reasonableness, and we will review Defendant's within range sentence under an abuse of discretion standard with a presumption of reasonableness.

In setting the length of Defendant's twelve-year sentences, the trial court considered seven enhancement factors. First, the trial court found that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and gave this factor "great weight." *See* Tenn. Code Ann. § 40-35-114(1) (2018). The trial court considered that Defendant, before trial, failed to comply with conditions of a sentence involving a release in the community and that, at the time the felony was committed, Defendant was released on probation. *See* Tenn. Code Ann. § 40-35-114(8), (13)(C) (2018). The trial court also considered that Defendant was a leader in the commission of an offense involving two or more actors. *See* Tenn. Code Ann. § 40-35-114(2) (2018). Further, the trial court determined that the offense involved more than one victim; that Defendant treated Mr. Garrett with exceptional cruelty; and that she abused a position of trust. *See* Tenn. Code Ann. § 40-35-114(3), (5), and (14) (2018).

In her brief, Defendant only challenges the last three enhancement factors applied by the trial court. She does not contest that the trial court properly relied on the first four factors, and we conclude the trial court's application of these enhancement factors is supported by the record. Because enhancement and mitigating factors are advisory, "the trial court may set a sentence anywhere within the applicable range so long as the sentence is consistent with the principles and purposes of the Act, regardless of the presence or absence of mitigating and enhancement factors." *State v. Mark Elihu Cooper*, No. W2013-02530-CCA-R3-CD, 2014 WL 4384965, at *6 (Tenn. Crim. App. Sept. 5, 2014), *perm. app. denied* (Tenn. Dec. 18, 2014). Thus, the trial court properly exercised its discretion in ordering Defendant to serve the maximum within-range sentences after finding at least four enhancement factors applied.

Further, the trial court properly exercised its discretion in ordering those sentences to be served consecutively. The trial court found that Defendant was a professional

criminal who had "knowingly devoted her life to criminal acts as a major source of her livelihood[.]" Tenn. Code Ann. § 40-35-115(b)(1) (2018). This finding is fully supported by the record. Defendant used her position as the pastor at Kingdom Dominion to steal large sums of money from the funds provided by DHS. The State's proof established that Defendant had no other source of income and no other known employment. Moreover, Defendant was on probation out of Florida for committing the same type of offense in that state.

On appeal, Defendant's main challenge relates to the trial court's additional finding that Defendant was a dangerous offender as a basis for consecutive sentencing. Tenn. Code Ann. § 40-35-115(b)(4) (2018). In *State v. Wilkerson*, the supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: (1) the court must find consecutive sentences are reasonably related to the severity of the offenses committed and (2) that consecutive sentences are necessary to protect the public from further criminal conduct. *State v. Wilkerson*, 905 S.W.2d 933, 937-39 (Tenn. 1995); *see also State v. Imfeld*, 70 S.W.3d 698, 707-08 (Tenn. 2002). Defendant correctly notes that the trial court failed to make the requisite *Wilkerson* findings necessary to support the imposition of consecutive sentences. However, while "the trial court failed to make the requisite findings in consideration of the dangerous offender factor," we note that "only one consecutive sentencing factor needs to exist to support the imposition of consecutive sentences." *State v. Dondrinkus T. Dickerson*, No. M2015-00012-CCA-R3-CD, 2016 WL 304403, at *8 (Tenn. Crim. App. Jan. 26, 2016), *no perm. app. filed*.

The trial court's finding that Defendant was a professional criminal is supported by the record. Under these circumstances, the trial court properly exercised its discretion in imposing consecutive sentences, and Defendant is not entitled to relief.

### *Restitution*

Finally, Defendant contends that the trial court erred when it ordered her to pay restitution to Mr. Garrett. She argues that Mr. Garrett "already settled out of court with [Defendant]" for $112,500. Defendant further contends that the offense of money laundering does not contemplate a victim under a plain reading of the language of the statute, and therefore, Mr. Garrett was not a victim to whom the court could award restitution. The State concedes that, under the facts of this case, Mr. Garrett was not a victim of Defendant's money laundering "because her conduct resulting in his receiving $15,000." The State agrees, therefore, that the judgment for money laundering in count two should be amended to remove the ordered restitution.

- 33 -

Trial courts possess the authority to order confinement in conjunction with restitution. Tenn. Code Ann. § 40-35-104(c)(2), (8) (2018); *State v. William Chandler Daniels*, No. E2009-02172-CCA-R3-CD, 2010 WL 5343776, at \*2 (Tenn. Crim. App. Dec. 23, 2010). Orders of restitution, including orders issued pursuant to section 40-35-104(c)(2), must follow the procedure outlined in Tennessee Code Annotated section 40-35-304. *See* Tenn. Code Ann. § 40-35-304(g) (2018); *State v. Brigitte Pauli*, No. M2002-01607-CCA-R3-CD, 2003 WL 21302991, at \*18 (Tenn. Crim. App. June 5, 2003).

In general, only "the individual or individuals against whom the offense was actually committed" are victims for purposes of restitution. *State v. Alford*, 970 S.W.2d 944, 945 (Tenn. 1998). Moreover, to be considered a victim for the purposes of restitution through a specific conviction, the individual must have suffered a loss as the "direct result" of that conviction. *See State v. J. Steven Brasfield*, No. W2009-00026-CCA-R3-CD, 2010 WL 669222, at \*3 (Tenn. Crim. App. Feb. 25, 2010), *no perm. app. filed*.

Tennessee Code Annotated section 40-35-304 defines "pecuniary loss" to be:

(1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

(2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(e) (2018). Special damages are those which are "the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence." *State v. Lewis*, 917 S.W.2d 251, 255 (Tenn. Crim. App. 1995) (quoting BLACK'S LAW DICTIONARY 392 (6th ed. 1990)). General damages are those which are "the necessary and immediate consequence of the wrong." *Id.* (quoting WEBSTER'S NEW INTERNATIONAL DICTIONARY 664 (2d ed. 1957)).

We agree with the parties that the trial court erred by awarding Mr. Garrett restitution in the amount of $172,370 as a victim of the offense of money laundering in count two. Under the State's theory, Defendant's conviction for money laundering arose out of her giving Mr. Garrett $15,000 of the money she had stolen from DHS as a down payment on a house. Because the offense dealt with Defendant giving Mr. Garrett money, he did not suffer any pecuniary loss as a "direct result" of the money laundering. Mr. Garrett's losses occurred after the money laundering offense had been completed. While we can understand the trial court's frustration with Defendant's conduct towards

Mr. Garrett, we conclude that the court erred by awarding Mr. Garrett restitution. Accordingly, the judgment form for money laundering must be amended to remove the ordered restitution.

### III. Conclusion

Based on the foregoing, the judgments of the trial court are affirmed, but the case is remanded for entry of an amended judgment for money laundering, removing the ordered restitution to Mr. Garrett.

_____
ROBERT L. HOLLOWAY, JR., JUDGE